## CITY OF PALESTINE et al. v. CITY OF HOUSTON et al. (No. 2850.)

(Court of Civil Appeals of Texas. Texarkana. April 24, 1924. Rehearing Denied May 8, 1924.)

**I. Courts ⬅207(5)—Appellate court may grant prohibition until judgment is completely executed by court below.**

Appellate court's authority to act in prohibition proceeding continues until its judgment completely executed by court below; the issuance of mandate from appellate court not exhausting its jurisdiction.

**2. Courts ⬅207(5)—Appellate court may issue prohibition after denial of writ of error by Supreme Court.**

Authority of Court of Civil Appeals to issue writ of prohibition to enforce its judg-

ment ceases only when its jurisdiction is lost by granting and perfecting of writ of error by Supreme Court, and if writ of error is denied this jurisdiction of the Court of Civil Appeals is not legally interrupted.

**3. Courts ⬅207(5)—Appellate, not district, court, may grant writ of prohibition to another district court.**

Appellate, not district, court, may grant writ of prohibition to district court of another county, for writ of prohibition cannot issue from one court to another of equal rank.

**4. Prohibition ⬅1—Defined.**

A writ of prohibition is a writ issued by superior court, commanding judge and parties to suit in inferior court to cease from further prosecution thereof on suggestion that cause or collateral matter arising therein does not belong to that jurisdiction, but to the cognizance of another court.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Prohibition (Writ of).]

**5. Courts ⬅207(5)—Prohibition cannot issue to prevent prosecution of suit not necessarily interfering with enforcing appellate court judgment.**

Writ of prohibition cannot issue to prevent prosecution of suit which does not attempt to immediately and necessarily interfere with due enforcement of judgment of appellate court.

**6. Courts ⬅207(5)—Prosecution of city's suit to enjoin railroad from maintaining general offices elsewhere held subject to prohibition as interfering with enforcing appellate court judgment.**

Further prosecution of suit by city and taxpayers thereof to enjoin railway company from maintaining general offices at any other place held subject to prohibition as necessarily obstructing and interfering with due enforcement of appellate court judgment perpetually restraining railroad from transferring offices from another city.

**7. Judgment ⬅675(2)—City assisting in railroad's defense of suit to enjoin maintenance of general offices therein held concluded by appellate court judgment enjoining transfer thereto.**

City of H., paying special attorneys to assist railroad's attorneys in defending suit by city of P. and citizens thereof to enjoin railroad from transferring general offices to H., held directly interested in subject-matter, and hence concluded by judgment granting injunction, though such attorneys, who signed railroad's trial answer, assisted railroad's attorneys in presenting defense and signed brief and argument on appeal, did not intervene or file distinct answer for city of H.

**8. Judgment ⬅702 — Judgment compelling railroad to maintain general offices in certain county and city, conclusive on all citizens of state.**

In view of Rev. St. art. 6429, judgment in suit brought in name of county, city therein, and citizens of both, to compel railroad, which is public highway (Const. art. 10, § 2), to per-

form duty under Rev. St. art. 6423, to maintain general offices in such county and city, concludes all citizens of state, as well as of city and county.

Original application, on relation of the City of Palestine and others, for writ of prohibition to restrain proceeding in suit by the City of Houston and others against the International & Great Northern Railroad Company. Writ issued.

This is an original application in this court, on the relation of the city of Palestine, county of Anderson, and seven specially named citizens of the city of Palestine, for the issuance of a writ of prohibition to restrain the proceeding in the district court of Harris county in a suit filed in that court by the city of Houston and five specially named citizens of Harris county, as plaintiffs, against the International & Great Northern Railroad Company, as defendant, wherein a judgment is being sought to establish at Houston the general office of that railroad company, and to have a mandatory injunction enforcing such judgment.

On January 14, 1914, by a judgment of the district court of Cherokee county in a suit wherein the relators were plaintiffs and the International & Great Northern Railway was defendant, the general offices, machine shops, and roundhouses of that railway company were permanently established and located at Palestine, and that railway company was perpetually enjoined from changing, keeping, or maintaining the same at any other place than the city of Palestine. On appeal to this court that judgment was affirmed in January, 1915 (174 S. W. 305), and an application for writ of error was denied by the Supreme Court. That cause was then carried to the Supreme Court of the United States by virtue of a writ of error to this court, and the judgment was affirmed (246 U. S. 424, 38 Sup. Ct. 370, 62 L. Ed. 807). The mandate from the court of civil appeals was issued in due course of time.

The present petition, lately filed in the district court of Harris county, reads:

"Now comes the city of Houston and Wm. A. Wilson, J. P. Houstoun, H. H. Haines, H. C. Schumacher, and Lucian M. Andler, citizens thereof who sue on behalf of themselves and all other citizens of the city of Houston, plaintiffs, and complain of the International-Great Northern Railroad Company.

"(1) The city of Houston is a municipal body corporate and duly incorporated under the laws of the republic and state of Texas, and the present city is a successor to all of the prior corporations of this city and town, from before the year 1854. It is situated in Harris county, Texas.

"(2) The other plaintiffs are representative citizens of Houston and sue on behalf of themselves and all other citizens of the city, and are residents and citizens of Harris county, Texas. Each of them own real and personal property in Houston, Texas, and are taxpayers therein.

"(3) The defendant, International-Great Northern Railroad Company, is incorporated under the laws of Texas and is a resident and citizen of Harris county and of the city of Houston, Texas; where it is provided by its charter, its public offices and general offices, and domicile, shall be, and where they are all required by law to be. R. E. Williams of Houston, Texas, is its agent, upon whom service may be made.

"(5) The citizens of Houston are numerous, aggregating some 200,000 people, and they have a joint and common interest in having the general offices of the I.-G. N. R. R. kept and maintained as required by law, by that railroad, at Houston. It is impracticable to make all the citizens parties and hence this suit is brought by the plaintiffs, the city and others, in behalf of each and all of the citizens of Houston, as well as in behalf of themselves, and the city.

"(7) By the act of September 1, 1856, the Legislature of Texas, constituted a corporation designated as the H. T. & B. and the act was entitled 'An act to incorporate the Houston Tap and Brazoria Railway Company.' The general offices of this corporation were, by this special act charter, located in Houston, and under it a railroad was constructed from Houston to or about the Brazos river, approximately as it now exists, but falling in debt to the state, it was provided by the act of the Legislature of August 15, 1870, entitled 'An act to provide for the sale of the Houston Tap & Brazoria Railway,' that the road should be sold, and it was accordingly sold and purchased by the H. & G. N., and is now a part of the defendant, I.-G. N.

"(8) The H. & G. N. R. R. was incorporated by an act entitled 'An act to incorporate the Houston & Great Northern Railroad Company,' dated October 22, 1866. By this charter the company was authorized to construct a railroad from Houston northward to the Red river, and to form a junction with any other railroad, and by section 13 of the act, and otherwise, the domicile and principal office of the company was located in Houston, where it was established in accordance with the charter.

"By the act of May 8, 1873, entitled 'An act to consolidate the Houston Tap & Brazoria Railway, the Huntsville Branch Railway and the Victoria & Columbia Railroad, with the Houston & Great Northern Railroad,' it was declared that all of these roads except the H. & G. N. were made parts of and 'under' the H. & G. N.

"(9) The International was chartered August 5th, 1870, by the act of the Legislature entitled: 'An act to incorporate the International Railroad Company and to provide for the aid by the state of Texas in constructing the same.' By this charter it was authorized to construct a railroad from a point on Red river across Texas, to a point at or near Laredo, and otherwise, as in the act provided.

"By section 14 it was provided that this road should have the right to connect itself with any other railroad within or without the state and to consolidate with the same, as also was provided in the charter of the H. & G. N. By its charter it was provided that the principal

offices should be established at a point on its line and that it might be moved from time to time as might be deemed expedient and necessary.

"(10) In 1872, 1873, and 1874, by agreements of the board of directors and the stockholders of the two roads they were consolidated under the title of the I. & G. N. R. R., and the Legislature recognized their consolidation, by an act of April 24, 1874, entitled 'An act to authorize the International & Great Northern Railroad Company to issue bonds,' and by an act of March 10, 1875, 'An act for the relief of the International Railroad Company, now consolidated with the Houston & Great Northern Railroad Company, under the name of the International & Great Northern Railroad Company.'

"In this way the I. & G. N. R. R. was formed. After its formation, as before, in the case of its constituents, various additions and extensions were made.

"(11) The International commenced the construction of its road and had its headquarters at Hearne, Texas, where they remained until their consolidation with the H. & G. N. when they were moved to Houston, where the H. & G. N. had always been; and on moving the headquarters of the International to Houston they were consolidated into the I. & G. N. R. R. with headquarters and general offices at Houston, Texas, as provided in the charter of the H. & G. N. they should be.

"(12) The I. & G. N R. R. Co. continued to operate as a railroad, but was sold out under the foreclosure in 1911, and under that foreclosure sale the properties were acquired by the I. & G. N. Ry. chartered under the laws of the state of Texas by charter issued in 1911, and in this charter it was provided that 'The place at which shall be established and maintained the principal business offices, the public offices, and the general offices of this corporation, is the city of Houston, Harris county, state of Texas.'

"(13) In August-September, 1911, the I. & G. N. Ry. was organized and acquired all the properties under the foreclosure of sale, above mentioned, of the I. & G. N. R. R., and by a deed of trust executed in 1911, conveyed all of its properties, owned or acquired, to the Central Union Trust Company of New York, then known as the Central Trust Company of New York, and in August, 1914, the obligations secured by this deed of trust being defaulted upon, the Central Union Trust Company of New York brought its bill for receivership and foreclosure in the United States District Court for the Southern District of Texas, at Houston, suing the I. & G. N. Ry. in No. 49 in equity on that docket, and on May 17th, 1915, this court entered a decree of foreclosure for the recovery of the amount due on the mortgage and the sale of the properties; and thereafter, in accordance with the decree of foreclosure, the properties were sold out in August-July, 1922, and the sale approved by the court on August 10, 1922, and, under the direction of the court, a deed made and delivered to the defendant I.-G. N. R. R. Co., hereinafter more particularly described, and it took possession of all the properties of the railroad, including those originally of the H. & G. N. and International and all the additions and betterments and all of the properties and roadbeds owned by the I. & G. N. R. R., amounting to about 1,106 miles of main track road and other property and at the end of November, 1922, entered upon the operation of the same.

"(14) The I.-G. N. R. R. was organized under the laws of Texas, August, 1922, using the charter of the sold out I. & G. N. Ry. Co. and amending the same, and changing this charter, among other things, so as to change the name from I. & G. N. Ry. to I.-G. N. R. R., but retaining the provision, as follows: '(3) The place at which shall be established and maintained the principal offices, the public offices and general offices of this corporation, is the city of Houston, in Harris county, state of Texas.' This charter, as so amended, was duly approved by the Attorney General of the state of Texas, and filed in the office of the secretary of the state of Texas, the 21st of August, 1922, and by him recorded, as provided by law.

"(15) By R. S. of Texas art. 6423, adopted in 1889, it is provided that every railroad company chartered by this state 'shall keep and maintain permanently its general offices within the state of Texas, at the place named in its charter, for the locating of its general offices.'

"By article 6424, also passed in 1889, it is provided that the railroad company shall keep and maintain at the place named in its charter the offices of the president, or the vice president, of the secretary, treasurer, local treasurer, auditor, general freight agent, traffic manager, general manager, general superintendent, general passenger and ticket agent, chief engineer, superintendent of motor power and machinery, master mechanic, master of transportation, fuel agent, general claim agent, and each and every one of its said general offices by whatsoever name, and the persons who perform the duties of the said general offices by whatever name known; and furthermore, that the persons holding such general offices shall reside at the place and keep and maintain their offices at the place where the general offices of said railroad are required by law to be kept and maintained by whatever name called, and as otherwise in said statute provided.

"(16) The H. T. & B., in and about the years 1856–1861, contracted and agreed with the city of Houston and certain representative citizens thereof, for themselves and other citizens of Houston, in consideration of certain rights of way and moneys and grants made to and received by the H. T. & B., and made by the city and the citizens, that the headquarters and general offices of that road should be located at and permanently and perpetually maintained in the city of Houston; and thereafter, in and about 1866–1871, the H. & G. N. contracted and agreed with the city of Houston and certain citizens acting for themselves and for other citizens, subscribers to a fund, that, in consideration of certain conveyances and moneys paid to this road by and on the part of the citizens of Houston, it (the H. & G. N.) would keep its headquarters and general offices permanently and perpetually in the city of Houston. Under the terms and authority of the statutes mentioned above, authorizing the consolidations, and of the charters of the various roads consolidated, and by the terms of those consolidations the International and other roads consolidated became obligated,

as the H. T. & B. and H. & G. N. were obligated, and contracted and agreed that the general offices and headquarters of the consolidated road should be at and in Houston, Texas. By article 6423 of the Revised Statutes of Texas it was provided that, if no place was named in the charter, then that the offices must be kept at the place where they were contracted for a valuable consideration to be kept.

"Wherefore, not yielding the contention that the offices were located by the charters of the H. T. & B., H. & G. N. and of the defendant at Houston, Texas, it is also alleged that they were contracted to be kept at Houston, Texas, as set out above.

"(17) On the organization of the new I.-G. N. R. R. of 1922, and its going into operation on December 1, 1922, and at no time thereafter did it consolidate at Houston, Texas, as required by law, its general offices, but has, in the town of Palestine, the general offices of the auditor, the treasurer, the chief engineer and all of its above-named general offices and clerks and officials comprising the same, except that the chief engineer has also a small office in Houston, and except ·that the traffic manager, not including the general passenger agent, has his office in Houston.

"(18) The persons composing the general offices of the defendant railroad residing at Palestine number about 300 employees, and with their families number about 650 persons.

"(19) There reside at Houston persons attached to the general offices and covered by the statute mentioned above about 28 persons who have families numbering over 180 persons. These persons are citizens of Houston and have their homes here and are property owners, and various persons now working in Palestine are also citizens of Houston, but are attached to the general offices wrongfully maintained at Palestine, and are illegally retained and employed there by the I.-G. N R. R. The plaintiffs herein represent all the citizens of Houston, and the city of Houston also represents their interests as plaintiff, as well as its own rights. All of them are property owners in Houston and the value of their property would be benefited by the moving to Houston of the people wrongfully employed and retained in Palestine.

"(20) Houston and the other plaintiffs herein are losers of a large sum of money by the maintenance of the general offices, in the larger part, at Palestine.

"Property interests are affected in the amount of over $100,000.00, and the city loses annually taxes in the amount of over $10,000.-00 and its merchants, and other citizens, a large amount which would come to them in legitimate commerce, if the law was not violated.

"A large number of the citizens of Houston, and a large part of the citizens who desire to come to Houston, are retained in Palestine by the defendant railroad, unless they resign their employment in which many of them have been long engaged.

"(21) Wherefore, on all of the above, the plaintiffs pray that the defendant be cited to answer hereto and that it be perpetually enjoined and prohibited from maintaining its general offices at any place except at Houston, Texas, as provided in its charter, and in the previous charters of this road, and as contracted to be kept; and that the defendant be compelled and required to move all of the employees of its general offices not now in Houston to Houston, and be prohibited from moving any away now there.

"The plaintiffs further pray that they have all such other relief, general and special, legal and equitable, as may be their due, and judgment for their costs."

The relators in their present application allege, among other things:

"For the purpose of hindering and preventing the execution of the said judgment and defeating the jurisdiction of this court, and of harassing the relators and putting them to additional cost, trouble and expense over an issue already litigated and finally determined, the respondents (except the said Walter Monteih, Judge of the Sixty-First judicial district court) have caused to be filed and there is now pending in the Sixty-First judicial district court of the state of Texas in and for Harris county, a suit, No. 106925, styled City of Houston et al. v. International-Great Northern Railroad Company, in which the plaintiffs in that suit pray and seek to obtain an injunction enjoining and prohibiting respondent International-Great Northern Railroad Company from maintaining its general offices at any place except at Houston, Texas, and requiring the International-Great Northern Railroad Company to remove all of the employees of its general offices not now in Houston, to Houston, and prohibiting said Railroad Company from moving any employees of its general offices now at Houston. The sole purpose and intent of the said suit and the sole effect of any order or relief which may be granted in favor of the plaintiffs therein, is and will be to defeat and frustrate the execution of the said judgment and the jurisdiction of this court and prevent the relators from enjoying the benefits of said judgment to which they are lawfully entitled, by prohibiting and excusing the respondent International-Great Northern Railroad Company from respecting and obeying the said judgment and the injunction therein decreed in favor of your relators.

"In the said suit pending in the Sixty-First judicial district court citation has been issued and served upon the International-Great Northern Railroad Company, requiring it to answer on October 1, 1923, and unless restrained by an order of this honorable court or one of the justices thereof, respondents, on October 1, 1923, or shortly thereafter, will cause to be entered in said suit an order or judgment which will be greatly to the prejudice of relators in the assertion and maintenance of their rights, against which, as well as against the maintenance of said suit, relators are without remedy except as herein prayed for."

To the present application the respondent the International-Great Northern Railroad Company files a general denial of the allegations made involving or touching it. It does not appear that the said railroad company made answer or any appearance at this time to the suit in the district court.

The other named respondents, except the district judge, specially plead, among other things, as follows:

"The records of this court will show that Anderson county, the city of Palestine, and others, including the relators here, brought a suit tried in the district [court] of Cherokee county, styled Anderson County et al. v. International & Great Northern Railway Company, and referred to in relators' petition; and in which suit they alleged that in 1872 a certain alleged agreement, or agreements, were made with the Houston & Great Northern Railroad Company, on which that suit was brought, and also that in 1875 certain alleged agreement, or agreements, were made with the International & Great Northern Railroad Company on which that suit was also brought. That suit was founded solely upon those alleged contracts claimed to have been secured by law. The suit of these defendants against the International-Great Northern Railroad Company now pending in the district court of Harris county was brought upon different issues, and sets up contracts with the Houston Tap & Brazoria Railroad Company, and the Houston & Great Northern Railroad Company made with the city of Houston, or its citizens, or both, and also sets up that these railroads were merged into the International & Great Northern Railroad Company and it sold out, and so the properties passed down to the International-Great Northern Railroad Company, and defendant in relators' petition.

"Also, in the suit of these defendants brought by them against the International-Great Northern Railroad Company, it is alleged that the charter acquired by that Road, and other charters, located the General Offices of that Railroad at and in the City of Houston, and that they are required by law to be kept there, as provided by said charters, and that the charter of the defendant Railroad so requires. Various other allegations are made in the suit brought by these defendants, and various issues totally different from those involved in the suit brought by Anderson county et al., in Cherokee county, and in support of said suit, and exhibit herewith and make a part hereof, a copy of the petition of these defendants against the International-Great Northern Railroad Company, filed in the district court of Harris county, Texas, and all this they are ready to verify."

The application of the relators and the answers of the respondents, with the evidence offered, were heard, argued, and submitted together at the regular term of this court and before the full court.

The petition and the decree of the trial court in the original cause are made a part of the statement here, and can be referred to as the same is set out in 174 S. W., beginning at page 319. The answer of the defendant in that suit is here referred to and made a part of this statement, as well as the decision and judgment of this court on the issues, as reported in 174 S. W. 305.

It especially appears that the district judge has not made any order nor taken any action in the suit in his court, nor has any order been presented to him for official action. The suit, as to the judge, stands merely as a cause filed on the docket of the court, with service of citation duly made on the defendant therein. It was shown as a fact that the city of Houston employed and paid special attorneys to assist in the defense of the suit in Cherokee county, and that such attorneys conferred and advised with and assisted the special attorneys for the International & Great Northern Railway Company in the defense of the suit and the trial thereof, and participated in the appeal of the case; but the special attorneys made no appearance for the city of Houston as such in any court, and they had no control nor direction over the litigation, the conduct and control of the litigation being by the general attorneys of the railway company.

Phillips, Townsend & Phillips, of Dallas, and E. V. Swift and A. M. Barton, both of Palestine, for relators.

S. B. Dabney, Walter Monteih, Sewall Myer, Walter F. Woodul and Wolters, Storey, Blanchard & Wolters, all of Houston, for respondents.

LEVY, J. (after stating the facts as above). [1] First, the respondents insist that jurisdiction is not vested in this court to issue the writ as here sought, as restraining an interference with the due execution of a prior final judgment of this court, since this court merely affirmed the judgment of the district court of Cherokee county, and did not modify or change it. The power and authority of the appellate court to act in the proceeding of prohibition is entirely dependent, in legal requirement, upon jurisdiction attaching and becoming active under an appeal or writ of error in the given case. The issuance of the writ in a proper case is in aid of such appellate jurisdiction, whether the judgment on appeal is affirmed or reversed and rendered. Wells v. Littlefield, 62 Tex. 28. As pertinent the following quotation is made from the opinion of the Supreme Court in the above case:

"Under our Constitution the Supreme Court has appellate jurisdiction only, and issues the writ of mandamus for the purpose solely of enforcing that jurisdiction. Const. art. 5, § 3. So soon as the jurisdiction attaches under an appeal or writ of error, this court has full control of the cause, and can make such orders concerning it as may be necessary to preserve the rights of the parties and enforce its mandates. This jurisdiction continues until the case, as made by the appeal or writ of error, is fully determined by this court and its judgment is completely executed by the court below. If the judgment below is affirmed, or reversed and rendered or reformed, this court can see that the party in whose favor its decision has been given has the benefit of all proceedings below necessary to enforce its judgment. If remanded for a new trial, it retains control until the new trial is allowed

in accordance with its mandate. If reversed and sent down to have some special judgment rendered by the court below, jurisdiction remains till that particular judgment is entered up, and the mandate of the court obeyed. For the purpose of enforcing all such orders coming within the appellate jurisdiction of the court it may resort to the writ of mandamus, or any other appropriate writ known to our system of jurisprudence."

Where the judgments of the trial courts were on appeal reversed and rendered, the writ of prohibition has been granted. Hovey v. Shepherd, 105 Tex. 237, 147 S. W. 224; Conley v. Anderson (Tex. Sup.) 164 S. W. 985; Id. 106 Tex. 80, 156 S. W. 197, 157 S. W. 937; Estey & Camp v. Luther (Tex. Civ. App.) 142 S. W. 649. And likewise in cases where the judgments of the trial courts were on appeal affirmed. Cattlemen's Trust Co. v. Willis (Tex. Civ. App.) 179 S. W. 1115; Williams v. Foster (Tex. Civ. App.) 229 S. W. 896. The judgment is as much the judgment of the appellate court in the one case as the other. The judgment of affirmance merges the judgment of the trial court, with the status of a final judgment of the appellate court. Having acquired jurisdiction by appeal, and having made final pronouncement in the case, the power of the appellate court to grant a writ of prohibition continues to enforce the judgment and its mandate, as the protection of it lies with such court. As stated in case of Willis, supra, this jurisdiction continues until the case, as made by the appeal or writ of error, is fully determined by this court and its judgment is completely executed by the court below. And, even though a mandate has issued from the appellate court, the authority of such court is not legally withdrawn to issue the writ, for the continued reservation of jurisdiction is implied in the appellate court to enforce the judgment. Cattlemen's Trust Co. v. Willis (Tex. Civ. App.) 179 S. W. 1115.

[2, 3] The authority of the Court of Civil Appeals to issue the writ legally ceases only when the jurisdiction of such court is lost or terminated by the granting and perfecting of a writ of error by the Supreme Court in the particular cause. It would follow, as a legal consequence, we think, that where a writ of error in a given cause is denied by the Supreme Court that court would be without active authority and power to entertain original proceedings of prohibition. For in such event the jurisdiction of the Court of Civil Appeals is not legally interrupted or vacated over the cause, any more so than if no writ of error had been applied for. The purpose of the writ of error, as provided by law, is merely to remove the cause to the Supreme Court, as a mode of appeal. Necessarily, upon the refusal of the Supreme Court to grant the writ, the cause is not removed to the Supreme Court, and the judgment of the Court of Civil Appeals remains final, having origin of legal finality from the date of the refusal of the writ of error. Also that the appellate court, and not the district court of Cherokee county in this instance, is empowered to grant such writ to the district court of Harris county is a settled rule, for the writ of prohibition cannot issue from one court to another of equal rank. See Steele v. State, 1 Tex. Civ. App. 495, 20 S. W. 946.

[4] The authorities all agree that a writ of prohibition is essentially—

"a writ issued by a superior court, directed to the judge and the parties to a suit in an inferior court, commanding them to cease from further prosecution of the same, on a suggestion that the cause originally, or some collateral matter arising therein, does not belong to that jurisdiction, but to the cognizance of some other court." 3 Blackstone, 112; 32 Cyc. p. 600; 22 R. C. L. p. 19.

[5] The appellate court having jurisdiction of the subject-matter, the further question is that of whether or not this proceeding is a proper one for the issuance of the writ applied for. The answer to the question depends upon the two points, viz.: (1) Whether or not the new suit in the district court of Harris county, urged as a distinct cause of action, has the necessary effect to directly interfere with and hinder the enforcement of the judgment of the appellate court, in the due exercise and preservation of rights which it established, and (2) whether or not the plaintiffs in the new suit are concluded by the final judgment in the former litigation. It is a firmly settled rule, and should be strictly adhered to, that a writ of prohibition cannot issue to prevent the prosecution of any suit which does not attempt to immediately and necessarily interfere with the due enforcement of the judgment of the appellate court, and which leaves its operation unimpeded. Milam County Oil Co. v. Bass et al., 106 Tex. 260, 163 S. W. 577. The new suit, in order to be subject to the writ of prohibition, must have the necessary effect to directly interfere with and hinder the enforcement of the judgment of the appellate court, in due exercise and preservation of the rights which it established, as expressed in the command of that court issued in its mandate. Hovey v. Shepherd, 105 Tex. 237, 147 S. W. 224; Conley v. Anderson (Tex. Sup.) 164 S. W. 985. And these cases above are quite pointedly illustrative of the line of demarcation between new suits which do not, and which do, necessarily involve the jurisdiction of the appellate court and amount to an interference with the due enforcement of the judgment and mandate of such appellate court, and therefore invade a jurisdiction forbidden to be entrenched upon. As pertinent, as a rule for guidance, the following quotation is made from the case of Bass et al., supra:

"A valid judgment should be effective to secure the benefits that it decrees; and its ac-

tive office therefore continues for the full accomplishment of that result. Any interference with its enforcement or the due exercise of rights which it establishes would amount to a violation of the jurisdiction of the court as a hindrance to its power to put the judgment into effect and preserve its operative force. But to disregard a judgment through the institution of a suit is not necessarily to obstruct its operation. True, it may draw the judgment into question through the denial of its effect, and the judgment may be so conclusive as to render the suit a groundless one; but the jurisdiction of the court is not invaded by the mere assertion of rights through such method, even in contravention of the judgment, so long as its operation is left unimpeded. If a court should entertain such a suit, and through want of jurisdiction or failure to accord to the judgment its legal effect render an erroneous decree, the remedy provided by our system for its revision and readjudication, if needs be, of the conclusiveness of the judgment, is an appeal. * * * The proper test of the question therefore is, not whether the suit recognizes or repudiates the effect of the judgment, since that does not necessarily involve the jurisdiction of the court, but whether it amounts to an interference with its due enforcement and therefore invades a jurisdiction it is forbidden to trench upon."

In that case, in applying the above rule, it was decided that—

"The pending suit in the district court of Hill county presents no interference with the decree of this court in McCord v. Sprinkel [105 Tex. 150, 141 S. W. 945], or its due execution."

It is clear in that record that the judgment of the Supreme Court was left in operation unobstructed, and would have full force and effect as to an acquittance to McCord and others if they complied with its terms, even though the plaintiffs in the second suit in Hill county recovered therein a favorable judgment. As to whether or not the judgment of the Supreme Court was in fact or in legal effect, appearing only incidentally so, conclusive of the second suit was purely a question, as a remedy by estoppel, for review by the method of appeal, if needs be. There is a distinguishment between that case and the case of Hovey, supra, presenting a second suit directly obstructing the due exercise of rights previously established by the appellate court's judgment. There the plaintiffs in the second suit were asking for "a writ of injunction forbidding them [the railway company] to remove the offices, etc., * '* * from the city of Sweetwater." The Supreme Court had previously rendered final judgment, at the suit of other parties plaintiff against the same railway company, denying the injunction to restrain the railway company from removing "the general offices, etc., from the city of Sweetwater." It was held that the second suit in effect necessarily challenged the judgment of the Supreme Court, nullify-

ing and thwarting the command of that court issued in its judgment, and directly operated upon its due enforcement. Again, in the Conley Case, supra, the Supreme Court had rendered final judgment to the effect that an injunction was improperly granted against Conley, as superintendent of public buildings and grounds of the state, from entering upon certain parts of the Alamo property and expending in its improvement certain moneys appropriated by the Legislature for that purpose. The plaintiffs in the second suit against Conley were seeking an injunction "against the prosecution of such work under allegations in substance that the $5,000 appropriation made by the Thirty-Second Legislature had lapsed, and that, as they were advised and charged, other moneys than the $5,000 appropriation were being or would be expended by Conley in such work." The Supreme Court in effect determined that the very institution of the second suit, in its nature, operated to be an interference with its judgment and the due exercise thereof, upon the ground that it constituted "a plain effort to assume the control of said parties in the execution of the judgment of this court," "by which their authority is clearly defined," and "no district court had jurisdiction to review that judgment, nor to interpret and enforce it, but must observe it as it was framed by this court."·

[6] In the light of these cases, applying the rule of law laid down, the conclusion is reached that the present suit in Harris county has the effect to necessarily obstruct and interfere with the due enforcement of the judgment of the appellate court, and therefore invades its jurisdiction. By the previous final judgment of the appellate court the International & Great Northern Railway Company was perpetually restrained "from changing the location of its general offices, etc., from the city of Palestine, and from keeping and maintaining its general offices,· etc., at any other place than Palestine, Texas, unless hereafter authorized by law so to do." The contest in that suit, on the answer of the railway company, was as to whether Palestine or Houston was the special place, in virtue of the statutory provisions, at which to permanently locate, keep, and maintain all the general offices of such railway company. With the judgment of the appellate court existing, and which the district court of Harris county has no power to undo, the whole legal duty is required of the railway company to perpetuallly keep and maintain its general offices at Palestine; that is, unless and until the statute law in respect thereto is changed. In the present suit in Harris county the plaintiffs therein do not assert any claim to have the general offices changed from Palestine to Houston predicated upon the right that the railway company, as "hereafter authorized by law so to do," was

under present legal duty to locate, keep, and maintain its general offices at Houston, and at no other place. The plaintiffs in the suit, as shown by their petition, expressly affirm a performance by the railway company of its duty under the mandate of the appellate court to the extent of "the maintenance of the general offices, in the larger part, at Palestine," and, merely claiming and asserting rights contrary thereto, seek to have the railway company "perpetually enjoined and prohibited from maintaining its general offices at any place except Houston, as provided in its charter, and the previous charters of this road, and as contracted to be kept; and that the defendant be compelled and required to move all the employees of its general offices not now in Houston, and be prohibited from moving any away now there." The institution of the suit, and its entertainment, in legal effect necessarily, and fundamentally, amounts to an interference with the due exercise and preservation of the rights which the judgment of the appellate court established, as an attempt to excuse and prohibit the railway company from complying with the mandate, and therefore immediately invades the jurisdiction of such court.

[7] Consequently, if the plaintiffs in the suit are concluded by the final judgment in the former litigation, the writ applied for ought to be granted. As concerns that particular point it becomes necessary to decide whether or not the record discloses that such former judgment is conclusive in legal view against the city of Houston and that said city is bound by the result of the litigation, in the following situations: (1) That the city of Houston became a party to that suit by active participation in the defense of the case through counsel, employed for that purpose, or (2) that the judgment was upon the subject of a public nature, in effect determining the rights and interests of the general public in their enlarged relationships, and not purely the private rights of any one. And it is believed that both situations affirmatively appear, as a matter of law, upon the face of the record, operating to conclude the plaintiffs from bringing and maintaining the present suit in Harris county. The city of Houston, having knowledge of the former suit, employed and paid special attorneys of its own choosing to appear therein and assist in the defense and to co-operate with the special attorneys of the railway company in carrying on the litigation in the trial and on appeal, having claim and interest in the subject-matter, in mutual relationship to and identified with the claim and interest of the railway company to the same right. The city of Houston, though not a formal party to the record, through its special counsel in fact appeared therein in actual representation in the name of the railway company, actively participating in the defense of the suit, wherein the rights of the city of Houston were directly put in issue and were as directly determined. As appears from the affidavit of the special attorneys, their employment and express authorization were "to assist in the defense of that suit," and "to render such services in the matter as the general counsel for the railway company saw fit to avail themselves of." And embracing the opportunity to appear in that suit, such special attorneys, as stated in the affidavit, did, and properly so as within the authorization of their employment by the city, "become connected with the case" and "consulted and advised with" and "had frequent conferences with" the special attorneys for the railway company, and did "render such services as counsel for the railway company saw fit to avail themselves of." It is evident, and not claimed otherwise, that in so acting and participating in the case such special attorneys were in fact acting, and they were so considered as acting, in the interest of their employment as distinct attorneys for the city of Houston, and not appearing purely as attorneys for the railway company. Although the special attorneys "did not answer or intervene for the city of Houston," yet, as appears, they signed, as within the scope of their employment, the trial answer of the railway company, and, assisted and co-operated with the attorneys for the railway company in presenting and urging the pleaded defense. The filed answer of the railway company, as pertinent, sets up:

"39. The defendant invokes the provisions of the charter of the Houston & Great Northern Railroad Company, and the other charters set out, or plead, whereby the domicile of that road and of the International & Great Northern Railroad was at Houston, Texas; and represents that the act of 1889, and as now in the Revised Statutes of Texas, if applicable, requires the domicile and offices to be in Houston, Texas; and defendants says that the charter of the Houston & Great Northern Railroad Company named Houston, Texas, as the place for the locating of the general offices, and that the International & Great Northern Railroad Company was a railroad whose charter named Houston, Texas, as the place for the locating of its general offices, and named no other place.—The town of Palestine is a town of about 10,000 population. It is not a manufacturing city, nor has it any large industrial or clerical population to draw from.— The city of Houston is a place of over 100,000 people, rapidly growing, with a large mechanical industrial population, and one of the great centers of railway activity in the state of Texas, and where there is a large supply of trained and expert clerical assistance obtainable, and where the executive offices of the railroad can be in constant contact with transportation problems and men, and where they can best serve the public and the interest of the defendant. None of these conditions exist at Palestine. The International & Great Northern Railway Company now alleges that if the

purposes of the present suit prevail it will be forever hampered, and the properties owned by it forever hampered and restricted in their proper uses, by the attempt to bind them down to Palestine and in restriction of its ability to perform its duties to the public and of the ability of the properties to perform such duties forever."

Also such special attorneys' names appear signed to the brief and argument presenting the litigation on the appeal of the case. Therefore the mere fact that the special attorneys did not intervene or file distinct answer for the city of Houston is of little weight and importance, since they could have done so, and instead elected, as is evident, to appear and defend in the name alone of the defendant railway company, as they had the right to do, the railway company consenting and not objecting to their appearance and co-operation in the defense. The city of Houston and the attorneys representing it were interested beyond merely voluntarily assisting the railway company in the defense. The city was directly, and not merely indirectly, interested in the subject-matter involved, as claimed by the railway company. She was identified in interest with the railway company, which was a party, in having the general offices maintained in Houston and at no other place. Interest, or the claim of interest, is the test, almost without exception, as to the right to be a party to a legal proceeding. In the circumstances, the city of Houston, and the public that it would legally represent, became bound by that judgment by so directly identifying itself through its attorneys, with the proceedings as to be a virtual party thereto. McMillan v. Barber Asphalt Paving Co., 151 Wis. 48, 138 N. W. 94, Ann. Cas. 1914B, 53; Cleveland v. Heidenheimer (Tex. Civ. App.) 44 S. W. 551; Lake v. Weaver, 80 N. J. Eq. 395, 86 Atl. 817. There is a clear distinguishment between the present proceedings and the case of Litchfield v. Goodnow's Adm'r, 123 U. S. 549, 8 Sup. Ct. 210, 31 L. Ed. 199. And the city of Houston would, in the circumstances, be bound by that judgment, although, as appears in the affidavit, the general attorney of the railway company was, in effect, the leading counsel, with the consequent and recognized right "to control the proceedings" in the case, as to the defendant of record. The real interests of all the special attorneys were in common and not antagonistic in the defense and trial of the case, having the single purpose and view to urge that defense that Houston, and not Palestine, was "the place for the locating of its general offices" under the statutory conditions and provisions. And there was an actual appearance of the special attorneys for the city of Houston in the defense, and they were not denied any co-operation in conducting the defense, which, as pleaded, was full and complete as to the rights of the city of Houston. Further, an appeal from the trial court's judgment was actually taken, all the attorneys participating therein. Being directly interested in the subject-matter of the suit, as the city of Houston was, and being accorded, as was done, the right to appear and actively co-operate in the defense, which directly put in issue its claim, and as well to participate in the appeal from the judgment, the city of Houston is not in a position to complain that it did not stand in the legal relation of a party to that suit, enabling it to be heard in the assertion of its claim. The further right to exclusively "control the proceedings," in addition to the "right to make a defense," was not essential in the circumstances. The rule of law applicable is thus stated in 1 Greenleaf on Evidence, § 523:

"Under the term parties, in this connection, the law includes all who are directly interested in the subject, and had a right to make a defense, or to control the proceeding, and to appeal from the judgment."

[8] In respect to the second point stated above it appears that the suit in Cherokee county was brought in the name of Anderson county, the city of Palestine and several individuals, against the railway company as such, to establish the obligation of the railway company under statutory conditions and provisions to keep and maintain its general offices in Anderson county and at Palestine, and to compel it to perform that duty. Whatever its form, that suit was essentially one to obtain relief or, remedy, having its origin in statute law. Article 6423, R. S., was invoked, by which it is provided that any railroad chartered by the laws of Texas "shall keep and maintain permanently its general offices within the state of Texas," either (1) "at the place named in its charter," or (2) "if no certain place is named in its charter where its general offices shall be located and maintained, then said railroad company shall keep and maintain its general offices * * * within this state where it shall have contracted or agreed, or shall hereafter contract or agree, to locate its general offices for a valuable consideration," or (3) "if said railroad company has not contracted or agreed for a valuable consideration to maintain its general offices at any certain place within this state, then such general offices shall be located and maintained at such place on its line in this state as said railroad company may designate to be on its line of railway." And passing upon the nature of the suit in the opinion on appeal (174 S. W. at page 316), it was determined that:

"If enforced according to the terms of the prayer, clearly the results of the suit belong to and inure to the public, as a duty owing to it. The defense of appellant and the right of appellees were entirely dependent upon whether a statutory provision of the state in respect

to charter rights of appellant in location of its domicile was applicatory. The decree was entirely dependent upon the statute, and not the enforcement of a private contract as such, for its vitality. The contract was only evidence in the line of facts going to prove the application of the statute, and did not operate or have the legal effect to create a lien in rem, or any other legal liability or claim in favor of appellees. * * * It is believed that the act [article 6423] could not properly be construed as undertaking to add to pre-existing contracts rights of a purely private character and to be enforceable as such. When a railway company bargains away for a valuable consideration the domicile of origin, the effect is more than a mere personal contract. It is a modification of the corporate franchise, and to that extent relinquishes and limits the charter obligation or privilege. * * * Manifestly the language of the act * * * expresses the purpose and intention of the Legislature to have only certainty of the location of the principal offices, * * * and to insist upon the domicile chosen by any railway company as suitable to it being final and unchangeable."

As determined also in the case of Hovey et al., supra, the maintenance of the general offices of a railway company at a certain locality "concerns the public interest." Then, as stated in the Hovey Case, supra,

"The important question in the case is reached by the announcement of the well-settled proposition of law that, if the matter adjudicated affected the interests of the public as distinguished from the private interest of the citizens of the city, although not parties to the suit, all citizens are concluded."

The term "all citizens," as referring to those who "are concluded" by a special proceeding of this character, includes all the people of the state as well as those of the local community where the suit is brought. It is certain that the local and special body of citizens in the community of Palestine and Anderson county had a vital interest in the maintenance of the general offices at Palestine and in establishing the statutory condition of fact applicatory thereto. But the immediate interest involved and sought to be protected was, not that of the exclusive, peculiar interest of the city of Palestine and county of Anderson, but that of the general public. The refusal of the company to perform its legal duty to the public of that community was not a wrong to them only, but to all the public in their enlarged relationship. The effect of the special proceeding was to enforce specific performance by the company of the requirements of the general law as a duty in the interest of all the public, at large as well as local. By way of analogy, the establishing and maintaining of a railway depot at a county seat, when the railway passes through or near the county seat of a county, concerns "the interests of the public who desire or are required to visit the county seat," and not the private interests "of the owners of property in the town." Railway Co. v. State, 106 Tex. 249, 163 S. W. 582. The judicial ascertainment of the definite locality or place fixed by law for the permanent location and maintenance of the general offices of a long line of railway assumes public importance beyond the confines of a particular city or county, and interests the public generally. For the statute expressly provides that at the general offices of the railway company "the principal business of said corporation shall be conducted, and stock transferred, and claims for damages settled and adjusted," etc. Article 6429, R. S. And by force of law railways, when once constructed, are declared public highways. Const. art. 10, § 2. It is a well-recognized rule, which has long prevailed in equity, that some, as representatives of a class, may sue for all. A municipal corporation, county or city, is, for many purposes, but a department of the state organized for the more convenient administration of certain powers belonging to the state. Counties are legal subdivisions of the state. Const. art. 11, § 1. A municipal corporation has, in some cases, the authority to maintain an action for the purpose of preserving the rights of the public, and a judgment for or against such county becomes binding on the public affected. A county or city has authority to maintain an action for the purpose of preserving the rights of the general public to the use of dedicated squares, or land claimed as such, within its limits. In such actions the municipal corporation is authorized to put in issue the rights of the people to such easement, and the state itself is bound by the result of such litigation, if the same is not collusive. In such respect the municipal corporation is in the nature, as it were, of a trustee of the people with respect to the property dedicated, or claimed to be dedicated, to public uses. The general offices were located in Anderson county, and the suit was brought in that county and was one substantially for the use and benefit of the people of the state. As the county was authorized by law, in the exercise of its implied power, to bring such action for the purpose, as its effect, of preserving the alleged rights of the people, the judgment would be equally binding upon the people of the state as upon the local public. The statute does not expressly forbid the exercise of such authority by the county.

The writ will issue, as applied for. The costs of the proceedings will be taxed against the city of Houston.